IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
v.                              )       No.  05-20233
                                )
ROOSEVELT HENDERSON,            )
                                )
        Defendant.              )

---

ORDER ON DEFENDANT'S MOTION TO SUPPRESS

---

        This cause is before the Court on the motion to suppress of
Roosevelt Henderson, through counsel of record, Clifton Harviel,
to suppress the fruit of an alleged non-consensual search
conducted on November 10, 2004 of both the Defendant, Roosevelt
Henderson, and his vehicle.  Defendant also seeks to suppress the
results of any interrogation conducted by law enforcement
officers, asserting that there was no executed advice of rights
form (Miranda).  Defendant specifically seeks the suppression of
the pistol found in the vehicle searched, as well as in the
alleged statements of the Defendant.


        The United States, in response to Defendant's motion,
asserts that on November 10, 2004, Memphis Police Department
officers responded to a "shots fired" call at 4022 Camelot in
Memphis, Tennessee.  It is asserted that the victim, Patricia

Jones, advised police that the Defendant, Roosevelt Henderson, had just fired shots into her home after she refused to admit him to the premises.  It is asserted that Jones provided the police with a description of both the Defendant and his vehicle.  The government asserts that the officers then observed the Defendant driving the described vehicle within the apartment complex where the victim lived and that a traffic stop was initiated.  The government contends that, upon being ordered to step out of the vehicle, the Defendant initially failed to comply but eventually exited the vehicle.  It is asserted that the officers noticed a handgun lying on the driver's side floorboard in plain view and that the Defendant was then arrested and his vehicle towed.

In connection with any statements, the government asserts that the Defendant was advised of his rights but refused to sign a right's waiver form.  It is asserted that he did agree to speak with officers about the incident, that he denied shooting at the victim, and asserted that he was standing outside the victim's apartment when the shots were fired.  It is asserted that the Defendant told the officers that he knew the handgun was inside the vehicle but that the handgun was not his (it belonged to his mother).  It is further asserted that the Defendant admitted to driving the vehicle on numerous occasions with the gun inside the vehicle.

THE EVIDENCE


A suppression hearing was held on August 19, 2005.  Five individuals testified:  Antoine Owens, a Memphis Police Department officer for five years; Lt. Donald Crowe, a 17 year veteran of the Memphis Police Department; George Wheeler, the "godbrother" of the Defendant; Roosevelt Henderson, the Defendant in this case; and Derwin Alexander Felix, a resident of apartment number 3, 4022 Camelot Lane and a relative of Patricia Jones, the asserted victim in the case.[1]

---

[1]The factual theories of the case could hardly be more variant. The arresting officer, East Precinct patrolman Antoine Owens, and the victim's relative, Derwin Felix, describe a police response to a "shots fired" call, the arrival of the officers, a description of the Defendant in his vehicle, and the subsequent detention of the Defendant in his vehicle, from which he was removed and at which time the firearm in the vehicle was seen. The Defendant describes the parking of his vehicle, his exiting the vehicle and proceeding toward the apartment building at which time, some considerable distance from the vehicle, his was approached and detained by the officers.

Under the defense theory of the facts, the search of the vehicle without the Defendant's consent or a search warrant would be a constitutional violation.  Under the government's theory, the removal of the Defendant from the vehicle would have been part of the police investigation and would, at least be based on reasonable suspicion based on specific and articulable facts. Terry v. Ohio, 392, U.S. 1, 27-32.  Under the government's theory of the facts, the firearm was in plain view.  U.S. v. Blair, 214 F.3d 690, 698 (6th Cir. 2000); see, Minnesota v. Dickerson, 508 U.S. 366, 374 (1993).

The Miranda issue relates to the testimony of Lt. Crowe (transcript at 36, 38, 39) (also see Exhibit 4) and Roosevelt Henderson (see transcript at 88).

Two witnesses supported the government's position regarding the circumstances of the Defendant's vehicle stop, removal from the vehicle, and detention.  Those witnesses were Derwin Alexander Felix and Memphis Police patrolman, Antoine Owens.

Derwin Alexander Felix

Mr. Felix testified that he lived at 8022 Camelot Lane, Apartment Number 3 with his wife, his stepdaughter, and his wife's aunt, Patricia Jones.  He stated that on November 10, 2004, he had contact with Roosevelt Henderson.  Specifically, Mr. Henderson had come to apartment number 3 to "do some repair work on the satellite TV."  Tr. at 108.  On that evening, Mr. Henderson was driving a gold Intrepid.  Some time during the evening, Mr. Felix was advised by a neighbor that tires on his vehicle had been cut.  Mr. Felix and his wife left the apartment to get something with which to repair the tires.  Tr. at 109. While they were gone, Mr. Felix testified that he received a call from Patricia Jones "saying Mr. Henderson had fired shots in the apartment . . . ."  Tr. at 110.

At that point, Mr. Felix and his wife returned to the apartment complex.  When they arrived, a police car was on the scene.  Mr. Felix talked with the officer.  Mr. Felix and other

4

individuals present gave the officers that arrived on the scene a
description of Mr. Henderson and the vehicle that he was driving
(a gold Intrepid).  Tr. at 110.

According to Mr. Felix, while he was talking with the
officers, he saw Mr. Henderson drive by the apartment in the gold
Intrepid and pointed that fact out to the officers.  According to
Mr. Felix, the officers then pursued the gold Intrepid and Mr.
Felix followed the officers in his own vehicle.  Mr. Felix saw
the squad cars stop the gold Intrepid (by this time there were
apparently at least two squad cars on the scene).  Mr. Felix
testified that the officers "jumped out of the car, and they was
talking to him to get him out of the car."  Tr. at 113.  After a
delay of about a minute, "They opened the door . . . they pulled
him out."  Tr. at 113.  Mr. Felix also saw one of the officers go
to the side of the gold Intrepid and "I heard something about we
found a weapon."  Tr. at 115.

Patrolman Antoine Owens

Patrolman Antoine Owens testified that around 9:30 in the
evening on November 10, 2004, he and his partner were dispatched
to 4022 Camelot, Apartment Number 3.  According to Officer Owens,
"We had 'shots fired' into an apartment."  Tr. at 8.  After

5

receiving the dispatch call, the officers arrived at the scene within five minutes.  Officer Owens testified that "I observed a bullet hole in the front bedroom window that came through the window from the outside, that it was lodged in the ceiling in the same room near the closet door." Tr. at 8.  Officer Owens testified that he spoke to the victim and the owner and several other people.  The victim, Patricia Jones, "said that her boyfriend had come by and shot into the house." Tr. at 9.

Officer Owens was told that the boyfriend's name was Roosevelt Henderson and Ms. Jones gave the officer a description including "his height and weight and the vehicle that he drove off in." Tr. at 10.  Officer Owens also indicated that there were other people on the scene and that one of those individuals was Derwin Felix.  Officer Owens was told by individuals on the scene that "there was other vehicles that the suspect supposedly put on flat, they saw a gold vehicle go by, and they started all -- the people started saying 'that's the vehicle right there,' so we got into our patrol cars, got behind him.  He then turned into the next cove that was behind the apartments that we were in like west of where we were located, and he then pulled into the

parking space.  We then put our sirens on, and then he just sat
in the car, and we asked him to get out.  He wouldn't get out.  I
told him to cut the car off, so we had to restrain him out of the
vehicle."  Tr. at 10-11.

    One of the officers, according to Patrolman Owens, who had
arrived on the scene at that time, was Officer Walker.  Officer
Walker had been in the area earlier in the evening investigating
the vandalism in connection with the slashing of the tires.
According to Officer Owens, Officer Walker was still in the area
in connection with that investigation when the other call came in
for "shots fired."  Tr. at 14.  Officer Walker was in the second
squad car that joined in the pursuit of the gold Intrepid.
Officer Walker, along with Officer Owens and Officer Owens'
partner, were involved in physical removal of Mr. Henderson from
his vehicle after that vehicle came to a stop.  Tr. at 15.
According to Officer Owens, the gold Intrepid was still running
(its engine was still on) after the officers removed Mr.
Henderson from the vehicle.  Tr. at 16.

    Officer Owens further testified that "we noticed that he had
a weapon inside the vehicle that was on the floorboard on the
driver's side seat."  Tr. at 17.  Specifically, Officer Owens
testified that "once we got around the vehicle, we looked inside,

cut the car off, that's when you could see it [the blue steel revolver] just hanging from up under the seat in plain view." Tr. at 17. Officer Owens testified that photographs were taken and that none of the officers handled the gun prior to the taking of the photographs. Tr. at 18.[2] The two photographs introduced as Exhibits 2 and 3 at the hearing show the location of the firearm as it was originally observed in the vehicle by the officers in the period immediately after the stop of Mr. Henderson and before the firearm was removed. Tr. at 20-21. Officer Owens testified that, because the officers were concerned that the Defendant might be armed, they had approached the vehicle in a cautious manner; Tr. at 20 ("if he had a weapon, that's how we have to stand just in case he pulls out a weapon . . .").

Once Mr. Henderson was removed from his vehicle, he was placed in Officer Walker's patrol car. Tr. at 27. Officer Owens

---

[2]A photograph was also taken of the vehicle itself and introduced as Exhibit 1 at the hearing. Exhibit 1 shows the gold Intrepid with the front door open. The officers identified the vehicle as having been parked as shown in the photograph (in a parking slot adjacent to the apartment building). This was somewhat different from the way in which Mr. Felix described the location of the vehicle (he did not recall that it had been in a parking slot). The photograph, however, was made at the time of the incident and appears to accurately indicate the location of the vehicle. Mr. Felix's failure to accurately remember the location of the vehicle appears to be a minor discrepancy and generally does not affect his credibility.

8

estimated that it was approximately 45 minutes before Mr.
Henderson was transferred to his (Officer Owens') vehicle to be
transported to 201 Poplar (the Shelby County Jail).  Tr. at 27.


Lt. Donald Crowe


     Lt. Donald Crowe in November, 2004, was a sergeant in the
Investigative Bureau of the Memphis Police Department,
specifically the Felony Response Bureau, midnight shift.  He
testified that on November 11, 2004, in the early morning hours,
he came in contact with Roosevelt Henderson.  He encountered Mr.
Henderson shortly after his shift began at midnight.  Mr.
Henderson had been arrested for aggravated assault and, according
to Lt. Crowe, was brought to his office for a follow-up
investigation.  The Lieutenant and a Sergeant Locastro spoke with
Mr. Henderson in an office in the Auto Theft Department, which
was adjacent to the Lieutenant's office on the 11th floor of 201
Poplar.  Tr. at 31.  Lt. Crowe testified that he read Mr.
Henderson his rights.  The advice of rights form that Lt. Crowe
and Sgt. Locastro used in talking to Mr. Henderson on that date
was marked as Exhibit 4 in the suppression hearing.  According to
Lt. Crowe, the information on the top of the form (personal
information, age, high school, etc. was supplied by Mr.

9

Henderson.  The advice of rights form is dated November 11, 2004 and the time is recorded as 0036 (12:36 a.m.).  Tr. at 33.  Lt. Crowe testified that Mr. Henderson said that he "didn't want to sign anything" in reference to the advice of rights form.  Tr. at 34.

Lt. Crowe then testified "well, I asked him if he was certain that he didn't want to give a statement because we wanted to give him an opportunity to tell his side of the story. Anytime there is a domestic violence situation, there's two versions as to what happened, and he said that he did not want to give a statement, but then he proceeded to tell us some events, personal facts about the night."  Tr. at 36.  According to Lt. Crowe, Mr. Henderson appeared "very calm . . . he was alert . . . ."  Tr. at 37.

Lt. Crowe testified that "the only question I asked was, was he certain or sure he did not want to give a statement, this was going to be his one opportunity to give a statement."  Tr. at 39. Lt. Crowe testified that there were no attempts at coercion, either physical or verbal by either himself or other officers. The Lieutenant further testified that it appeared that Mr. Henderson understood the rights that he had been read out loud. Tr. at 39.  The Lieutenant further indicated that he wrote on the

form the exact words Mr. Henderson said when he was asked to sign
the advice of rights form -- "been there, done that.  I know, I
know."  Exhibit 4; Tr. at 34.

        According to Lt. Crowe, "he (Mr. Henderson) said that he had
given a typed statement before in a previous case and his words
had been twisted against him, and he didn't want to give a
statement."  Tr. at 34.  It appears from Lt. Crowe's testimony
that he was with Mr. Henderson from between 15 and 30 minutes.
Tr. at 44-45.  After that time, Lt. Crowe escorted Mr. Henderson
from the desk where he was being interviewed to the holding bench
in the Felony Response Office.  Tr. at 40.  Lt. Crowe and Sgt.
Locastro then continued their investigation, including taking a
statement from Patricia Jones, the victim, in order to determine
if there was a basis to charge Mr. Henderson.

                        Roosevelt Henderson

        The Defendant, Roosevelt Henderson, testified regarding the
contact that he had with the police on the evening of
November 10, 2004.  Tr. at 77.  According to Mr. Henderson, he
stepped out of his automobile and started walking toward the
steps at an apartment building.  When he arrived at the steps, he
heard someone say "hey Roosevelt."  He turned around and saw that

                                11

it was a police officer, and that officer then said "come here."
Tr. at 78.  Mr. Henderson testified that he then turned around
and started walking toward the officer but that the officer told
him to "walk backwards with my hands on top of my head."  Tr. at
78.[3]

   Mr. Henderson also testified that earlier in the day he had
been driving his mother's white Oldsmobile but when he came back
to the apartment complex between 9 and 9:30, he was driving his
own vehicle - a Dodge Intrepid.  Tr. at 82.  According to Mr.
Henderson, it was the Dodge Intrepid that he had just parked and
from which he was walking up to the apartment steps when an
officer stopped him as previously described.  According to Mr.
Henderson (on page 83 of the transcript) "I didn't really get to
say something [to the officer] because after then, the officer
went to cursing me out, and we verbally got into it, he was
calling me, hey, you know, punk, what you doing, blah, blah,
blah, blah, blah, blah, and I responded 'man, I'm not no punk,
you know.'"  Tr. at 83.[4]  Mr. Henderson then testified that the

---

[3]Mr. Henderson also described events much earlier in the evening
including preparation for a card game and the beginning of a card
game at approximately 6:30 p.m.  Tr. at 78-79.  His testimony
confirmed that, on November 10, he was involved in taking some
satellite equipment to Derwin Felix and Patricia Jones'
apartment.  Tr. at 79.

[4]Mr. Henderson's testimony appears to be internally
inconsistent.  First he describes the event as one in which the

officer with whom he was arguing then said "where's the pistol."
Tr. at 84.  According to Mr. Henderson, the officer then put him
"spread eagle" on the car and

> He took the car keys out of my hand, and when
> the second car pulled up, he throwed the keys
> to him, he opened the car because my car has
> a lock on it that you can lock from the
> outside, he throws the key, he said "find
> it."  He says "yeah, I found it."  He says
> "where was it hidden?"  He said, "under the
> driver's seat."  And when I looked back, he
> was coming out of the glove compartment.

Tr. at 84, lines 11-17.  According to Mr. Henderson, he was then
taken to Ms. Patricia Jones' location; she came out and said
"yeah that's him" and then they took him downtown (201 Poplar).
Tr. at 84.  Mr. Henderson testified that he did not give the
police permission to open up his automobile and that, in fact, no
one asked him for permission.  Tr. at 85.

Mr. Henderson also testified about events in connection with
the interview at 201 Poplar with Lt. Crowe and Sgt. Locastro and
the events surrounding Exhibit 4, the advice of rights form.  Mr.
Henderson stated that I told him (Lt. Crowe) "that I wasn't

---

officer said "come here" and then ordered him to turn around,
with his hands on his head, and back toward the officer.  Tr. at
78.  Whereas on page 83 of the transcript, Mr. Henderson
describes being cursed at by the officer and becoming involved in
a verbal exchange.

signing anything without a lawyer present." Tr. at 86.  He confirmed, however, that he (Henderson) read all or a part of the format aloud and "he say you got the right to remain silent, I say 'okay.'"  Tr. at 86.

Mr. Henderson then testified that he repeatedly stated that he did not want to make a statement without a lawyer present.  He specifically testified as follows:

> Well, it was just about after every question,
> like -- because it sort of went like this,
> you sure you don't want to make a statement,
> you sure you don't want to make a statement.
> It is two sides at least to a story, you sure
> you don't want to make no statement?  I said
> no, I don't want to make a statement without
> a lawyer present.  So it went from there to
> come on, Roosevelt, like old buddy, old chum,
> come on, Roosevelt, you know, you just got
> mad and let off a couple of rounds, it ain't
> nothing.  It is like, man, I told you I don't
> want to make no statement, and I ain't shot.
> This went on for about 45 minutes to an hour.

Tr. at 86, l3-23.

George Wheeler

The fifth witness to testify was George Wheeler.  Mr. Wheeler testified that he has known Mr. Henderson for about about

14

30 years and that Mr. Henderson is his "godbrother."[5]  According
to Mr. Wheeler, on November 10, 2004, he saw Mr. Henderson "at a
card party . . . in the Camelot Apartments . . . ."  Tr. at 49.
According to Mr. Wheeler at some point in the evening, he decided
to leave the card party and go to the store.  As he was getting
up to go, he testified that he saw Roosevelt "coming up the
walkway."  Tr. at 50.  Henderson, according to the testimony, was
10 to 15 feet away from Wheeler when a squad car came around the
corner.  Tr. at 50-51.  Mr. Wheeler testified "one of the
officers called Roosevelt . . . they told him to come here, and
he went over to them.  . . . The next thing I know, he was spread
across the hood getting searched.  [And] the officer took the
keys [to the car]."  Tr. at 51.  According to Wheeler, an officer
then unlocked the automobile door and conducted a search of the
vehicle, finding a firearm on the passenger side of the vehicle
in the glove box.  Tr. at 52-53.

      According to Mr. Wheeler, the search of the vehicle occurred
before the second police car arrived.  Tr. at 54.  The second car
arrived, Mr. Wheeler testified, "when I came back from calling

_____

[5]Mr. Wheeler explained that "it is like he adopted me."  Tr. at
48.

his [Henderson's] mother." Tr. at 54.[6]  Wheeler stated that he
went to call Henderson's mother after an officer said he had seen
the gun, and that the officer had "got the gun." Tr. at 54.  Mr.
Wheeler said it took between five and eight minutes to call Mr.
Henderson's mother, Addie Henderson.  During this period,
according to Wheeler, he also told the "people at the card party
that the police had Roosevelt." Tr. at 54.  Mr. Henderson then
left the scene because "I didn't want to be there." Tr. at 55.[7]
Mr. Wheeler recalled that, at an earlier time in the afternoon,
Mr. Henderson had been driving a white Oldsmobile. Tr. at 63.
Mr. Wheeler testified that the officers, in addressing the
Defendant initially "called him Roosevelt." Tr. at 65-66.  Then
Mr. Wheeler stated "I assume they didn't know who Roosevelt was,
but they called his name out." Tr. at 66.

     During cross-examination, Mr. Wheeler was asked about his
location when he first saw Mr. Henderson.  In cross-examination,
Mr. Wheeler testified "I'm walking the whole time, and I seen him

---

[6]Mr. Wheeler testified that he went to call Mr. Henderson's
mother and he told the people at the card party "that the police
had Roosevelt."

[7]In cross-examination, there was extensive inquiry as to the
time or approximate time of the events that lead to Mr.
Henderson's arrest in this case.  See Tr. at 60-63.  Mr. Wheeler
also testified that Henderson received a phone call around 7:00
p.m. (this would appear to be the phone call in connection with
the television satellite equipment).

come around the corner." Tr. at 69. Mr. Wheeler then stated "he was away from the parking lot" and further stated "and he was coming up the walk. As a matter of fact, he was getting ready to come up the walk." Tr. at 70.

On re-direct, Mr. Wheeler said that he first saw Mr. Henderson "getting ready to come up the walkway [to the apartment]. Tr. at 73-74. On re-direct, Mr. Wheeler again confirmed that he recalled hearing a police officer call the Defendant, saying "hey Roosevelt." Tr. at 74. According to Wheeler, Mr. Henderson then turned around and walked 10 or 12 steps toward the officer. Tr. at 74-75. Wheeler further indicated "the officer was standing still." Tr. at 75.

                              ANALYSIS

Observation of the witnesses and a careful analysis of the transcript strongly supports the credibility of Officer Owens and Lt. Crowe, as well as the testimony of Mr. Felix. As can be seen from portions of the transcript that had been quoted in this opinion, Mr. Henderson's testimony is both internally inconsistent and clearly exaggerated. Mr. Wheeler, a close friend of Mr. Henderson and his family, while supplying some testimony that is supportive of Mr. Henderson, also calls into

                                17

question Mr. Henderson's second version of the event (in which Henderson describes a verbal altercation with the initial detaining officer).

The officers in this case, the evidence supports, conducted an appropriate investigative stop and brief detention based on reasonable suspension of criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). The officers had received a report of shots fired and were responding to that call. Additionally, they received reports from residents of the apartment complex concerning vandalism. The officers received a description of the Defendant and the vehicle which he was believed to be driving. Moreover, while the officers were conducting the investigation, the Defendant arrived and individuals who were supplying information to the officers pointed the Defendant and his vehicle out. The officers proceeded with a traffic stop, removed the Defendant from his vehicle, and then saw in plain view (as is clearly shown in photographs, Exhibits 2 and 3) a firearm.

In the instant case, there was a proper basis to stop the defendant based on the officers awareness of the specific and articulable facts which gave rise to reasonable suspicion of criminal conduct as previously discussed. United States v. Garza, 10 F. Ed 1241, 1245 (6th Cir. 1993). Secondly, the degree

18

of intrusion into the Defendant's personal security was reasonably related to the scope of the situation at hand. The officers' conduct was reasonable given their suspicions and the surrounding circumstances. At the time of the arrest of the Defendant, the officers had reasonable grounds to believe that the Defendant was responsible for the shooting and that his detention was appropriate under the circumstances.

Moreover, the officers were entitled to search the Defendant's vehicle incident to the lawful arrest of the Defendant. Therefore, even if it assumed that the Defendant stepped out of his vehicle and locked it (the court does not find that credible evidence supports this proposition), the search of the vehicle which resulted in the recovery of the firearm would have been appropriate as a search incident to the arrest.

The critical fact, of course, is that the firearm in this case was in fact in plain view. The plain view exception permits the warrantless seizure of an object since, in this case, the officer was lawfully positioned in a place where the object could be plainly viewed, the incriminating character of the object was immediately apparent, and the officer had a lawful right to access to the object itself. Horton v. California, 496 U.S. 128 (1990).

The Defendant also seeks to suppress his statements, asserting that they were not made freely and voluntarily.  It is clear that a Miranda warning was given in this case.  See Exhibit 4.  Defendant's version of what he now says transpired during his interview with Lt. Crowe on the 11th floor of 201 Poplar, was simply incredible.  In this case it is clear that the Defendant asserted his right to have counsel present during any interrogation.  It is also equally clear, however, that after asserting that right, the Defendant initiated further communications, exchanges, and conversations with the police. Edwards v. Arizona, 451 U.S. 477 (1988).  The government has shown by preponderance of the evidence that the accused, having asserted his right to counsel, subsequently waived that right by initiating further communications.  U.S. v. Mills, 1 F.3d 414 (6th Cir. 1993).[8]   The court finds that under the totality of

---

[8]Once the Defendant asserted his right to counsel, further inquiry of the Defendant should cease by the investigating officers.  In this case, it appears that the officer did ask the Defendant to reconsider his decision.  Such a request does not constitute further investigative inquiry by the officer but simply represents an effort to confirm the decision of the Defendant.  While better practice would suggest that not even a clarifying inquiry be made, in this particular case the loquaciousness of the Defendant is apparent throughout the transcript.  It appears that the Defendant, just as was the case during portions of his examination during the hearing, proceeded to volunteer information that was not responsive to any particular inquiry.  While the question of suppression of Defendant's statements is somewhat closer than the question of suppression of the firearm in this case, the evidence clearly preponderates in favor of the government on the question of suppression of the statements made to Lt. Crowe as well.

the circumstances, the statements of the Defendant were the product of an essentially free and unconstrained choice.  There is no indication that the Defendant's will was, in anyway, overborne.  There is simply no credible proof of any police coercion regarding Defendant's statements in this case.

Defendant's motion to suppress the fruit of the search conducted on November 10, 2004 and to suppress the statements of the Defendant on November 11, 2004 is, therefore, DENIED.

ENTERED this 2nd day of February, 2006.

s/ JON P. MCCALLA
UNITED STATES DISTRICT JUDGE

21